## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BARK *et al.*,                             :
                                          :
          Plaintiffs,                     :        Civil Action No.:    12-1505 (RC)
                                          :
v.                                        :        Re Document Nos.:    30, 33, 35
                                          :
UNITED STATES FOREST SERVICE,             :
                                          :
          Defendant,                      :
                                          :
          *and*                           :
                                          :
NATIONAL FOREST RECREATION                :
ASSOCIATION *et al.*,                     :
                                          :
          Intervenor–Defendants.          :

## MEMORANDUM OPINION

**DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT;
GRANTING FEDERAL DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; AND
GRANTING INTERVENOR–DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

"National Forests are made for and owned by the people."  Gifford Pinchot, U.S. Dep't of

Agric., Forest Serv., *The Use of the National Forests* 25 (1907).  This litigation revolves around

the ability of the people to access their National Forests—or, to be more specific, certain

designated recreation areas within the National Forests—without being charged a fee.  In 2004,

Congress enacted the Federal Lands Recreation Enhancement Act, Pub. L. No. 108-447, div. J.,

tit. VIII, 118 Stat. 3377 (2004) (codified as amended at 16 U.S.C. §§ 6801–14 (2012)) ("REA"),

which sought to ease access to public lands by placing detailed restrictions on the recreation fees

the United States Forest Service and other federal agencies may charge to visitors.  The case at

bar presents a novel legal question:  whether the REA's fee restrictions extend beyond the Forest Service to third parties, known as "concessioners" or "concessionaires," who operate recreation areas within our National Forests.

Bark, an Oregon non-profit organization, joined five individual plaintiffs to initiate this suit against the Forest Service pursuant to the Administrative Procedure Act ("APA").  Plaintiffs challenge the Forest Service's issuance of several special use permits, along with its overall policy of issuing such permits, on the ground that the permits allow concessioners to charge restricted fees in violation of the REA.  Plaintiffs also challenge the same for failure to undergo the public notice and review procedures set forth in the REA.  The concessioners holding the challenged permits have joined the case as intervenors.

Currently before the Court are the parties' cross-motions for summary judgment.  For the reasons set forth below, the Court finds that the REA's requirements and restrictions do not extend to third-party concessioners.  Accordingly, the Court will deny Plaintiffs' motion for summary judgment and grant Defendants' motions for summary judgment.

## II.  BACKGROUND

### A.  The REA

In the late nineties, many recreational areas within our public lands were not free to visitors.  As part of the Recreational Fee Demonstration Program, Pub. L. No. 104-134, § 315, 110 Stat. 1321, 1321-200 to -202 (1996) (codified as amended at 16 U.S.C. § 460*l*-6a(a)–(f) (2000)) ("Fee Demo Program"), *repealed by* REA, Pub. L. No. 108-447, div. J., tit. VIII, § 813(b), 118 Stat. 3377, 3390 (2004), which was originally enacted within a large appropriations measure, the Forest Service and other federal agencies collected admission fees from visitors in exchange for access to designated recreational areas on federal lands.  The Fee

Demo Program was a pilot program whose purpose was "to demonstrate the feasibility of user-generated cost recovery for the operation and maintenance of recreation areas or sites and habitat enhancement projects on Federal lands." *Id.* § 315(a).

In 2004, Congress replaced the pilot program with the REA, Pub. L. No. 108-447, div. J., tit. VIII, 118 Stat. 3377 (2004) (codified as amended at 16 U.S.C. §§ 6801–14 (2012)), which sets forth in more detail the types of fees federal agencies administering public lands may and may not charge to visitors. The REA authorizes the Secretary[1] to "establish, modify, charge, and collect recreation fees at Federal recreational lands and waters . . . ." 16 U.S.C. § 6802(a) (2012). "The term 'recreation fee' means an entrance fee, standard amenity recreation fee, expanded amenity recreation fee, or special recreation permit fee." *Id.* § 6801(8).

This case deals with standard amenity recreation fees ("SARFs"). A SARF is a fee authorized by section 3(f) of the REA, which provides:

> Except as limited by subsection (d), the Secretary may charge a standard amenity recreation fee for Federal recreational lands and waters under the jurisdiction of the Bureau of Land Management, the Bureau of Reclamation, or the Forest Service, but only at the following:
>
> > (1) A National Conservation Area.
> >
> > (2) A National Volcanic Monument.
> >
> > (3) A destination visitor or interpretive center that provides a broad range of interpretive services, programs, and media.
> >
> > (4) An area—
> >
> > > (A) that provides significant opportunities for outdoor recreation;
> > >
> > > (B) that has substantial Federal investments;
> > >
> > > (C) where fees can be efficiently collected; and

---

[1] Under the REA, "the Secretary" means either the Secretary of the Interior or the Secretary of Agriculture. *See* 16 U.S.C. § 6801(10) (2012).

(D) that contains all of the following amenities:

      (i) Designated developed parking.

      (ii) A permanent toilet facility.

      (iii) A permanent trash receptacle.

      (iv) Interpretive sign, exhibit, or kiosk.

      (v) Picnic tables.

      (vi) Security services.

*Id.* § 6802(f). But as the statute says, the Secretary's power to charge a SARF is "limited by subsection (d)," which prohibits recreation fees for certain activities, services, persons, and places. *See generally id.* § 6802(d). For purposes of this case, the relevant fee restriction is found in subsection (d)(1)(A), which prohibits fees "[s]olely for parking, undesignated parking, or picnicking along roads or trailsides." *Id.* § 6802(d)(1)(A). Although "[r]esearch indicate[d] that new fees [under the Fee Demo Program] altered a very small percentage of visitation decisions across the full spectrum of income levels," H.R. Rep. No. 108-790, pt. 1, at 13 (2004), the restrictions imposed by the REA were meant to be "overly prescriptive to alleviate concerns of those who no longer trust certain federal land management agencies with the recreation fee authority." *Id.* at 14.

The REA also establishes a process by which the public may "participate in the development of or changing of a recreation fee established under [the REA]." 16 U.S.C. § 6803(a) (2012). Whenever a new or amended recreation fee is proposed pursuant to the REA, the Secretary must publish a notice in the *Federal Register* and local publications near the affected site. *See id.* § 6803(b). The statute also calls for the establishment of Recreation Resource Advisory Committees ("RRACs") to review and make recommendations on recreation

fee proposals based on public concerns in the surrounding region. *See generally id.* § 6803(d).

RRAC meetings are open to the public. *See id.* § 6803(d)(11)(A).

Under its sunset provision, the REA is currently slated to expire on December 8 of this

year. *See id.* § 6809.

## B. Concessioners

Not all fee areas within our National Forests are managed by the Forest Service. Since

1950, the Secretary of Agriculture has had authority under the Granger–Thye Act, ch. 97, § 7, 64

Stat. 82, 84 (1950) (codified as amended at 16 U.S.C. § 580d (2012)), "to permit the use by

public and private agencies, corporations, firms, associations, or individuals, of structures or

improvements under the administrative control of the Forest Service and land used in connection

therewith . . . ." *Id.* Thus, under government-issued permits, third-party concessioners are able

to charge visitors for access to designated recreation areas within our National Forests.

These permits are issued under a series of regulations promulgated by the Forest Service.

*See generally* 36 C.F.R. §§ 251.50–.65 (2013). The regulations set forth a multi-layered

approval process for the screening of special use proposals, *see id.* § 251.54, and the reviewing

officer is required to reject applications that fail to satisfy certain criteria, such as compatibility

with land management goals and furtherance of the public interest, *see id.* § 251.54(e)(5). The

concessioner's use is limited to the activities specifically authorized in the permit, *see id.*

§ 251.55(a), and all issued permits must include certain terms, such as liability and

indemnification terms, and terms necessary to ensure compliance with public health and safety

requirements, *see id.* § 251.56. This approval process applies not just to the initial application,

but also to proposals to change an existing permit. *See id.* § 251.61.

This case involves the legality of fees charged by concessioners for recreation areas in five National Forests: Rose Canyon Lake in Coronado National Forest; Second Crossing in Tonto National Forest; Rampart Reservoir in Pike National Forest; Walton Lake in Ochoco National Forest; and the Big Eddy day-use area and Bagby Hot Springs in Mount Hood National Forest. *See generally* Compl. ¶¶ 21–24, 26–27, ECF No. 1; Mot. Intervene 2–5, ECF No. 12. The permits issued to the concessioners for each of these recreation sites impose specific responsibilities upon the concessioners and require them to provide certain services in accordance with an annual operating plan. *See generally* A.R. 795–824, 930–70, 1565–89, 2071–102, 3381–400. Each permit states that it is issued pursuant to the Granger–Thye Act and its implementing regulations, *see* A.R. 795, 930, 1565, 2071, 3381, and none of the permits underwent the RRAC review process set forth in the REA.

The Rose Canyon Lake recreation area in Coronado National Forest is operated by Recreation Resource Management, Inc. ("RRM"). *See* Meyer Decl. ¶ 4, ECF No. 12-6. Under its operating plan, RRM is required to maintain a parking lot; keep roads, trails, and walkways clear; inspect the area for safety hazards; maintain regulatory signs; provide security; provide emergency and first-aid assistance; clean, repair, and maintain restrooms; clean up litter and empty trash receptacles; provide information to visitors through staff and signs; and provide a drinking water dispenser, among many other services. *See generally* A.R. 825–54. In April of 2012, Plaintiffs Gaye Adams and Greg Lewis visited Rose Canyon Lake and were asked to pay a fee before parking. *See* Adams Decl. ¶¶ 2, 4, ECF No. 25-2; Lewis Decl. ¶¶ 2, 4, ECF No. 25-3. Ms. Adams and Mr. Lewis were both informed that they must pay an eight-dollar fee to park, or, alternatively, they could park along the road and enter the fee area for one dollar; senior passes were not accepted. *See* Adams Decl. ¶¶ 6–7; Lewis Decl. ¶¶ 4, 6. They testify that they parked

in the lot, walked around the lake, and did not use any services. *See* Adams Decl. ¶¶ 12–13; Lewis Decl. ¶¶ 12–13.

RRM also operates the Second Crossing recreation area in Tonto National Forest. *See* Meyer Decl. ¶ 5. Under its operating plan, RRM is required to maintain a parking lot; provide security; ensure that occupancy limitations are enforced; clean, repair, and maintain restrooms; clean up litter and empty trash receptacles; monitor the area for purposes of disease control; provide and maintain signs for visitors; provide radio communication in case of an emergency; and monitor the area for safety hazards, among many other services. *See generally* A.R. 971–99. In June 2012, Plaintiff Stephen Sample, a resident of Cave Creek, Arizona, visited the Second Crossing area with a friend. *See* Sample Decl. ¶ 2, ECF No. 25-4. Upon their arrival at the parking lot, Mr. Sample and his companion encountered a notice stating that visitors were required to deposit a six-dollar "recreation permit fee" into a fee container. *See id.* ¶ 3. Mr. Sample parked, paid the fee, and hiked in the areas along the river. *See id.* ¶ 5. He testifies that he and his friend did not use any of the facilities or services, which consisted of only a toilet, picnic tables, and a sign directing payment. *See id.* ¶ 6.

Rampart Reservoir in Pike National Forest is operated by Rocky Mountain Recreation Company ("RMR"). *See* Roberts Decl. ¶ 3, ECF No. 12-7. Under its operating plan, RMR is required to maintain a parking lot; monitor and maintain roads, paths, and trails in the area; inspect the area for safety hazards; provide security; provide emergency and first-aid assistance; clean, repair, and maintain restrooms; clean up litter and empty trash receptacles; provide information to visitors through staff and signs; maintain water lines for drinking water; and test drinking water, among many other services. *See generally* A.R. 1604–721. In May of 2012, Plaintiff David Wimert, a resident of Longmont, Colorado, visited the Rampart Reservoir area.

*See* Wimert Decl. ¶ 2, ECF No. 25-6.  Upon arrival, his vehicle was stopped at an entrance station where visitors were required to pay a six-dollar fee.  *See id.* ¶ 4.  Because Mr. Wimert held a senior pass, his fee was three dollars.  *See id.* ¶ 5.  He paid the fee, parked his vehicle, and walked around the reservoir.  *See id.* ¶ 6.  He testifies that he did not use any services, but noticed that the camp sites were not clean and the restroom was "filthy."  *See id.*

Walton Lake in Ochoco National Forest is operated by Aud & Di Campground Services, Inc. ("Aud & Di").  *See* Hunn Decl. ¶ 3, ECF No. 12-9.  Under its operating plan, Aud & Di must maintain a parking lot; enforce vehicle parking rules; provide emergency and first-aid assistance; clean, repair, and maintain restrooms; clean up litter and empty trash receptacles; maintain water lines for drinking water; and monitor and test for diseases such as hantavirus, among many other services.  *See generally* A.R. 3433–58.  In August 2012, Plaintiff Scott Silver, a resident of Bend, Oregon, visited the Walton Lake area with his wife.  *See* Silver Decl. ¶ 3, ECF No. 25-5.  Upon their arrival, they encountered a fee station informing them that they were required to pay a five-dollar "day-use" fee.  *See id.* ¶ 5.  When Mr. Silver asked the nearby hosts whether they would accept his federally-issued Northwest Forest Pass, they declined.  *See id.* ¶ 6.  Mr. Silver paid the five-dollar fee, parked his car, and walked around the lake with his wife.  *See id.* ¶¶ 9–10.

The Big Eddy day-use area in Mount Hood National Forest is operated by California Land Management Services Corporation. ("CLM").  *See* Mart Decl. ¶ 3, ECF No. 12-8.  Under its operating plan, CLM is required to maintain a parking lot and roads; plow and maintain roads; provide security; address hazardous materials spills; enforce site capacity limits; clean, repair, and maintain restrooms; clean up litter and empty trash receptacles; monitor the area for safety hazards; provide services in case of an emergency; maintain signs for visitors; and maintain

water systems, among many other services. *See generally* A.R. 2103–76. In August of 2012, Meredith Cocks, a resident of Multnomah County, Oregon and member of Bark,[2] visited the Big Eddy day-use area. *See* Cocks Decl. ¶¶ 1, 5, ECF No. 30-1. When she arrived, she found that the area had been placed under private management and that many of the vehicles parked along the wide shoulder of Highway 224 had "courtesy notices" on their windshield asking them to pay a five-dollar fee. *See id.* ¶¶ 5–6. Ms. Cocks chose not to pay the fee and spent her time on the natural rock formations in and along the Clackamas River. *See id.* ¶¶ 6–7. While she notes that the area offers a restroom and picnic tables, she testifies that she chose not to use those amenities. *See id.* ¶ 7.

CLM also manages the Bagby Hot Springs area in Mount Hood National Forest. *See* Mart Decl. ¶ 3. CLM operates Bagby Hot Springs under the same operating plan that applies to the Big Eddy day-use area. *See generally* A.R. 2103–76. Duties relating specifically to the Bagby Hot Springs include enforcing the springs' "no alcohol" rule and imposing time limits so that all visitors can enjoy the springs. *See* A.R. 2134, 2139. The operating plan further provides: "Hikers planning to hike through to the Bull of the Woods Wilderness will be allowed to park in the trailhead parking lot, access the trail, and hike through. They will not be required to pay a fee as long as they are not using the hot springs site." A.R. 2134. In July of 2012, Plaintiff Amy Harwood, a resident of Portland, Oregon and member of Bark, hiked through the Bull of the Woods Wilderness and exited through the hot springs bath house area. *See* Harwood Decl. ¶ 8, ECF No. 25-1. Although Ms. Harwood and her hiking group did not use the hot springs, a CLM representative charged her group a fee of five dollars per person, even though she informed the representative that hikers were not required to pay a fee. *See id.* ¶¶ 9–11.

---

[2] Unlike the other individuals whose visits are described in this section, Ms. Cocks is not named as a plaintiff in this case.

### C. Procedural Background

Bark is an Oregon-based non-profit organization of about seven thousand members. *See* Compl. ¶ 5, ECF No. 1. It has been particularly active in the administrative process concerning the transfer to private management of several sites within Mount Hood National Forest. *See id.* On September 11, 2012, Bark joined the individual plaintiffs in filing this lawsuit against the Forest Service. *See generally id.* Plaintiffs challenge the Forest Service's issuance of the above-described special use permits, *see supra* Part II.B, asserting that the REA prohibits the fees that the concessioners are charging and, even if the fees were allowed, the permit proposals did not undergo the REA's RRAC review process. *See* Compl. ¶¶ 20–31. Plaintiffs also challenge the Forest Service's "policy and practice" of issuing special permits that allow concessioners to charge fees that would not be allowed under the REA, and its "policy and practice" of doing so without RRAC review. *See id.* ¶¶ 29, 31.

On December 7, 2012, the concessioners operating the recreation sites involved in this litigation moved to intervene as defendants, along with the National Forest Recreation Association, an advocacy group for businesses that offer outdoor recreation opportunities. *See generally* Mot. Intervene, ECF No. 12. The Court granted the motion on February 1, 2013. *See* Order, ECF No. 18. The Forest Service and Intervenor–Defendants all assert that the REA is inapplicable to this litigation, citing section 14(e), which provides: "Notwithstanding any other provision of this chapter, a third party may charge a fee for providing a good or service to a visitor of a unit or area of the Federal land management agencies in accordance with any other applicable law or regulation." 16 U.S.C. § 6813(e) (2012).

Now before the Court are the parties' cross-motions for summary judgment.

### III.  LEGAL STANDARD

Typically, a court may grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  But when assessing a summary judgment motion in an APA case, "the district judge sits as an appellate tribunal." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001).  In a case such as this, the "complaint, properly read, actually presents no factual allegations, but rather only arguments about the legal conclusion to be drawn about the agency action." *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993).  "The entire case on review is a question of law, and only a question of law." *Id.*  The district court's review "is based on the agency record and limited to determining whether the agency acted arbitrarily or capriciously[,]" *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009), or in violation of another standard set out in section 10(e) of the APA, *see* 5 U.S.C. § 706 (2012).

### IV.  ANALYSIS

#### A.  Final Agency Action

Before reaching the merits of Plaintiffs' claims, the Court first considers the scope of the matter on appeal.  Under the section 10(c) of the APA, only "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."  5 U.S.C. § 704 (2012); *accord Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 885 (1990) ("When, as here, review is sought not pursuant to specific authorization in the substantive statute, but only under the general review provisions of the APA, the 'agency action' in question must be 'final agency action.'"); *Am. Tort Reform Ass'n v. OSHA*, 738 F.3d 387, 395 (D.C. Cir. 2013) ("The APA only provides for judicial review of final agency

action . . . ." (internal quotation marks omitted)).  Although the D.C. Circuit has occasionally

characterized the issue as "jurisdictional," *see, e.g.*, *Cobell v. Norton*, 240 F.3d 1081, 1095 (D.C.

Cir. 2001) ("Whether there is a final agency action is also a jurisdictional question."), the court

has clarified that it used that term loosely and, in fact, "the APA's final agency action

requirement is not jurisdictional."  *Trudeau v. FTC*, 456 F.3d 178, 184 (D.C. Cir. 2006).  Instead,

where there is no final agency action, a plaintiff simply has no cause of action under the APA.

*See id.* at 185 ("Although the APA does not confer jurisdiction, what its judicial review

provisions, 5 U.S.C. §§ 701–06, do provide is a limited cause of action for parties adversely

affected by agency action." (citing *Ctr. for Auto Safety v. NHTSA*, 452 F.3d 798, 805 (D.C. Cir.

2006))).  In their prayer for relief, Plaintiffs seek a declaration that the Forest Service's

"policies" of (1) permitting concessioners to charge fees to visitors who do not use any facilities

or services other than parking, and (2) issuing special use permits to such concessioners without

undergoing the public notice and RRAC processes, violate the REA.  *See* Compl. Req. Relief

¶¶ 1–2, ECF No. 1.  Plaintiffs also seek vacatur of these "policies."  *See id.* ¶ 3.  Defendants

argue that Plaintiffs' claims are not cognizable to the extent they seek relief from these "policies"

because Plaintiffs point to no "final agency action" other than the five permits issued to the

Intervenor–Defendants.  *See* Def.–Intvrs.' Cross-Mot. Summ. J. 40, ECF No. 33; Fed. Def.'s

Mem. P. & A. Supp. Cross-Mot. Summ. J. 26 n.9, ECF No. 35-1.[3]  Plaintiffs argue that broad

pronouncements of invalidity are appropriate once an as-applied challenge is established.  *See*

Pls.' Reply 21–22, ECF No. 38.

---

[3] The parties do not dispute that Plaintiffs have stated a claim in relation to the five
identified permits.  The scope of the "final agency action" dispute is limited to Plaintiffs'
challenge to the Forest Service's alleged overarching "policy" of issuing such permits.

Defendants have the better argument here. As defined in the APA, "'agency action' includes the whole or part of an agency rule, order, license, sanction, relief, or the equivalent thereof, or failure to act . . . ." 5 U.S.C. § 551(13) (2012). These various types of agency action all share a common feature—they are limited to "discrete" actions by an agency. *See Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 63 (2004) (applying the canon of *ejusdem generis* to the term "failure to act"). "Because 'an on-going program or policy is not, in itself, a final agency action under the APA,' [a court's] jurisdiction does not extend to reviewing generalized complaints about agency behavior." *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) (quoting *Cobell v. Norton*, 240 F.3d at 1095). Plaintiffs point to no written rules, orders, or even guidance documents of the Forest Service that set forth the supposed policies challenged here. Instead, Plaintiffs appear to have attached a "policy" label to their own amorphous description of the Forest Service's practices. But a final agency action requires more. In *Lujan*, the Supreme Court rejected a challenge to the Bureau of Land Management's so-called "land withdrawal review program"—a program that was not derived from any authoritative text, but was instead the agency's own term for describing certain continuing operations. *See Lujan*, 497 U.S. at 890. Such a program "is no more an identifiable 'agency action'—much less a 'final agency action'— than a 'weapons procurement program' of the Department of Defense or a 'drug interdiction program' of the Drug Enforcement Administration." *Id.* Similarly, the Forest Service's alleged "policy" of issuing special use permits that infringe the substance and procedure of the REA is found in no authoritative text, and is instead a "generalized complaint about agency behavior" that gives rise to no cause of action. *Cobell v. Kempthorne*, 455 F.3d at 307.

Plaintiffs cite to *Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010), for the proposition that "once a case is brought, no general categorical line bars a court from

making broader pronouncements of invalidity in properly 'as-applied' cases."  Richard H. Fallon, Jr., Commentary, *As-Applied and Facial Challenges and Third-Party Standing*, 113 Harv. L. Rev. 1321, 1339 (2000), *quoted in Citizens United*, 558 U.S. at 331.  However, the Supreme Court's analysis in *Citizens United* dealt with the distinction between a facial and an as-applied challenge to an extant statute.  *See Citizens United*, 558 U.S. at 331–36.  The case did not contain any discussion of the meaning of "final agency action" under the APA.  Rather, the petitioner's claims in that case were based on a codified federal statute, and not the petitioner's own characterization of a generalized, unwritten administrative "policy."  *See id.* at 321 (describing Citizens United's constitutional challenge to specific sections of the McCain–Feingold Act).

Plaintiffs point to no authoritative text, let alone any final agency action, setting forth the Forest Service "policies" they challenge in this litigation.  Therefore, the Court rejects such challenges and will limit its analysis to the five special use permits identified in the complaint.

## B.  Concessioner Fees (Count I)

As noted above, the REA prohibits the Forest Service from charging a recreation fee "[s]olely for parking, undesignated parking, or picnicking along roads or trailsides."  16 U.S.C. § 6802(d)(1)(A) (2012).  At the center of this litigation is a dispute over whether this prohibition similarly restricts the fees that concessioners may charge to visitors.  Plaintiffs argue that it does, and thus challenge the five issued permits as agency actions taken "not in accordance with law [or] in excess of [the Forest Service's] statutory jurisdiction [or] authority . . . ."  5 U.S.C. § 706(2)(A), (C) (2012).

Resolution of this dispute largely turns on the interpretation of section 14(e) of the REA, which provides that, "[n]otwithstanding any other provision of this chapter, a third party may

charge a fee for providing a good or service to a visitor of a unit or area of the Federal land management agencies in accordance with any other applicable law or regulation."  16 U.S.C. § 6813(e) (2012).  According to Plaintiffs, the provision does not allow concessioners to charge fees "in a way that the agency itself cannot charge . . . ."  Pls.' Mot. Summ. J. 1, ECF No. 30. Defendants argue that, because the concessioners' fees are authorized under the Granger–Thye Act, the REA's restrictions do not apply to concessioners.  *See* Def.–Intvrs.' Cross-Mot. Summ. J. 38–39, ECF No. 33; Fed. Def.'s Mem. P. & A. Supp. Cross-Mot. Summ. J. 12–17, ECF No. 35-1.  No federal court has yet had the opportunity to weigh in on the interpretation of section 14(e), and thus the Court approaches the issue as a matter of first impression.

Interpretation of an administrative agency's guiding statute is a two-step process.  *See Am. Airlines, Inc. v. TSA*, 665 F.3d 170, 176 (D.C. Cir. 2011).  "First, always, is the question whether Congress has directly spoken to the precise question at issue.  If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984).  However, if "Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction of the statute, as would be necessary in the absence of an administrative interpretation."  *Id.* at 843 (footnote omitted).  In this latter situation, a court instead proceeds to step two of the *Chevron* framework: "[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."  *Id.*  At this stage of the analysis, "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency."  *Id.* at 844.

But not all agency interpretations are entitled to *Chevron* deference. "Deference in accordance with *Chevron* . . . is warranted only 'when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.'" *Gonzales v. Oregon*, 546 U.S. 243, 255–56 (2006) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001)). Thus, where an agency's interpretation lacks the force of law, it is "beyond the *Chevron* pale." *United States v. Mead Corp.*, 533 U.S. 218, 234 (2001); *accord Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000). Instead, courts may afford some deference to a non-binding agency interpretation of its guiding statute to the extent the interpretation has the "power to persuade." *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) ("We consider that the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance."). A court assesses the persuasiveness of an interpretation based on such factors as the agency's thoroughness, consistency, formality, or expertise in issuing the interpretation. *See Reno v. Koray*, 515 U.S. 50, 61 (1995) (formalities); *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 417 (1993) (consistency); *Aluminum Co. of Am. v. Cent. Lincoln Peoples' Util. Dist.*, 467 U.S. 380, 390 (1984) (expertise); *Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 142 (1976) (thoroughness), *superseded by statute on other grounds*, Pregnancy Discrimination Act of 1978, Pub. L. No. 95-555, § 1, 92 Stat. 2076, 2076, *as recognized in Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 89 (1983).

For the reasons set forth below, the Court finds that the language of section 14(e) clearly exempts the concessioners from the restrictions set forth in the REA. Even if there were some

ambiguity within this provision of the REA, the Court, applying *Skidmore* deference, is

persuaded by the Forest Service's interpretation that the Granger–Thye Act controls.  Thus, the

fees charged by the concessioners in this case are valid.

### 1.  Language of the REA

Section 14(e) of the REA provides:  "Notwithstanding any other provision of this chapter,

a third party may charge a fee for providing a good or service to a visitor of a unit or area of the

Federal land management agencies in accordance with any other applicable law or regulation."

16 U.S.C. § 6813(e).  It is Defendants' position that this clause exempts third-party

concessioners, who operate under permits issued pursuant to the Granger–Thye Act and its

implementing regulations, from the requirements of the REA.  *See* Def.–Intvrs.' Cross-Mot.

Summ. J. 38–39; Fed. Def.'s Mem. P. & A. Supp. Cross-Mot. Summ. J. 12–17.  Plaintiffs

concede that the permits were issued under the authority of the Granger–Thye Act, *see* Pl.'s

Reply 21, ECF No. 38, but argue that concessioners may not charge recreation fees "in a way

that the agency itself cannot charge," Pl.'s Mot. Summ. J. 1.[4]

In interpreting an administrative agency's guiding statute, the Court first "must give

effect to the unambiguously expressed intent of Congress."  *Chevron*, 467 U.S. at 842–43.  To

ascertain the intent of Congress as expressed in a statute, the Court first looks to the plain

language of the statute at hand.  *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997); *United*

---

[4] The precise formulation of Plaintiffs' interpretation is difficult to pin down.  They also assert that the "notwithstanding" clause (1) "does not allow [concessioners] to charge a fee when they do not provide a good or service and a visitor simply wishes to park and go hiking on undeveloped federal land"; and, more broadly, (2) prohibits concessioner fees "when a good or service is not provided."  Pl.'s Mot. Summ. J. 22; Pl.'s Reply 15.  The Court thus harmonizes these statements and understands Plaintiffs' position as follows:  Section 14(e)'s exemption of third parties who provide a "good or service" applies only to third parties providing goods or services for which the Forest Service itself would be permitted to charge a fee, and not, for example, to third parties who charge solely for parking.

*States v. Barnes*, 295 F.3d 1354, 1359 (D.C. Cir. 2002). This inquiry is dispositive "if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'" *Robinson*, 519 U.S. at 340 (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 240 (1989)).

The Supreme Court has noted that "the use of . . . a 'notwithstanding' clause clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section." *See Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993) (citing *Shomberg v. United States*, 348 U.S. 540, 547–48 (1955)). However, courts applying this principle have been careful to adhere to more general canons of statutory interpretation by applying a "notwithstanding" clause in context with the rest of the statute in which it appears. For example, where literal application of the clause would lead to so broad an application that it would negate another section of the same statute, courts have applied a narrower reading of the "notwithstanding" clause. *See, e.g.*, *Or. Natural Res. Council v. Thomas*, 92 F.3d 792, 797 (9th Cir. 1996) ("Were subsection 2001(b)'s phrase 'notwithstanding any other provision of law' given the broadest possible interpretation, subsection 2001(f)(4)'s allowance for legal challenges to salvage timber sales based on non-environmental laws would be nugatory."). Such a case adheres to "the common-sense principle of statutory construction that sections of a statute generally should be read 'to give effect, if possible, to every clause[.]'" *Heckler v. Chaney*, 470 U.S. 821, 829 (1985) (quoting *United States v. Menasche*, 348 U.S. 528, 538–39 (1955)). Or, where one of the superseding items described in a "notwithstanding" clause is ambiguous, courts have read the ambiguous subject matter narrowly, in order to keep the term in harmony with the other items listed in the statute. *See, e.g.*, *James v. Von Zemenszky*, 284 F.3d 1310, 1317 (Fed. Cir. 2002) ("The phrase 'conditions of employment' appears between the

terms 'hours' and 'leaves of absence,' which suggests that the term was meant to refer to matters such as work assignments and scheduling, and was not meant to be so broad as to encompass [removal procedures].").  Such a reading follows the canon of *noscitur a sociis*, the interpretive rule that terms "can be construed in light of their accompanying words in order to avoid giving the statutory exception unintended breadth . . . ."  *Marachich v. Spears*, 133 S. Ct. 2191, 2201 (2013) (internal quotation marks omitted).

Section 14(e) allows third parties to "charge a fee for providing a good or service" notwithstanding any other provision of the REA.  16 U.S.C. § 6813(e).  Plaintiffs argue that the clause does not foreclose the applicability of the REA's fee restrictions to permits issued under the Granger–Thye Act because the two acts are not in conflict.  According to Plaintiffs, section 14(e) "meshes perfectly well with the REA's allowance of charging for the use of a developed amenity, and disallowance of charging of a fee for parking and undeveloped recreation."  *See* Pls.' Mot. Summ. J. 23 (citing *James*, 284 F.3d at 1317, and *Or. Natural Res. Council*, 92 F.3d at 797).  Though it is unclear, their assertion appears to be based on the notion that the meaning of "good or service" encompasses only goods or services for which the Forest Service itself would be able to charge.  *See id.* at 22; *see also supra* note 4.  But Plaintiffs' interpretation collapses under its own weight.  If concessioners were only allowed to charge fees under the circumstances set forth in the REA, then there would be no conflict with laws such as the Granger–Thye Act, therefore rendering section 14(e) a dead letter.  Such a reading would be impermissible, as "[i]t is [a court's] duty 'to give effect, if possible, to every clause and word of a statute,' rather than to emasculate an entire section . . . ."  *United States v. Menasche*, 348 U.S. 528, 538–39 (1955) (citation omitted) (quoting *Inhabitants of Montclair Twp. v. Ramsdell*, 107 U.S. 147, 152 (1883)).

Plaintiffs' reading also overlooks the plain language of the REA. Section 14(e) broadly allows third parties to "charge a fee for providing a good or service . . . in accordance with any other applicable law or regulation." 16 U.S.C. § 6813(e). Under the REA, the Forest Service would not be permitted to charge a fee for an undeveloped campsite that provided only tent spaces, drinking water, toilet facilities, and refuse containers. *See id.* § 6802(d)(1)(E), (g)(2)(A). But if a third party managed the same campsite, it would indeed be providing "services" to visitors under any reasonable interpretation of the word. Similarly, the REA prohibits the Forest Service from charging fees "[s]olely for parking," *id.* § 6804(d)(1)(A), but providing for parking is also a "service."[5] Application of these prohibitions beyond the Forest Service to third parties would therefore conflict with section 14(e), which broadly allows third parties to charge fees for a "good or service."[6] The section contains no proviso clarifying that concessioners may charge only for "goods or services" not prohibited by section 3(d)—to the contrary, it allows authorized

---

[5] There appears to be some dispute as to the scope of this restriction even as it relates to the Forest Service itself. The full restriction prohibits fees "[s]olely for parking, undesignated parking, or picnicking along roads or trailsides." 16 U.S.C. § 6802(d)(1)(A). According to the Forest Service, this subsection prohibits only fees for parking "along roads or trailsides." *See* Fed. Def.'s Reply 15–16, ECF No. 41. In such a situation, parking is arguably not a "service." Plaintiffs do not expressly offer a construction, but the Court infers that they read the restriction more broadly to include developed parking lots, as several plaintiffs parked in such lots but assert that the fee violates the REA. *See, e.g.*, Sample Decl. ¶ 4, ECF No. 25-4. Although the Court is skeptical of the Forest Service's construction (one is unlikely to park along a trailside) and notes that the construction does not adhere to the "last antecedent rule," under which a qualifying phrase not separated by a comma modifies only the adjacent item in the list, *see* 2A Norman J. Singer & J.D. Shambie Singer, *Sutherland Statutes and Statutory Construction* § 47:33 (7th ed. 2011), the Court need not resolve the issue in this case. Subsection (d)'s restrictions on camping fees, described above, are sufficient to show that the subsection conflicts with the "notwithstanding" clause.

[6] Plaintiffs argue that a broad application of section 13(e) will render the REA a "nullity," because the Forest Service could bypass the statute by allowing third parties to charge fees that the Forest Service cannot. *See* Pl.'s Reply 9. But a broad application of this section of the statute does not nullify the remainder of the REA; it simply recognizes that Congress has set forth a statutory scheme that restricts the Forest Service itself while allowing pre-existing schemes governing third-party concessions to operate unaltered.

third-party fees "[n]otwithstanding *any* other provision of [the REA]." *Id.* § 6813(e) (emphasis added). Because Congress was aware of the Forest Service's practice of authorizing fee-charging concessioners to operate recreation sites before the REA was enacted, Congress was likely aware of the conflict it was creating by phrasing the "notwithstanding" clause so broadly. Where such a conflict exists, the clause clearly indicates that the law authorizing the fee overrides the REA. *See id.* The Court therefore finds that the REA's restrictions do not apply to third parties who charge fees for goods or services as part of the Forest Service's concession program.

Plaintiffs argue that, if the REA's limitations do not apply to third parties, then there would be "no limitations on how recreation fees may be imposed, despite Congress's intention that recreation fees on public land be strictly prescribed." Pl.'s Reply 1; *see also id.* at 9 ("[T]he Court should not accept the Defendant's position that private concession fees on Forest Service land are entirely exempt from the REA and thus subject to no restrictions whatsoever."). But Plaintiffs' argument ignores the Forest Service's review process for third-party special use permits, which requires special uses to be, among other things, in the public interest and compatible with the purposes of land management. *See* 36 C.F.R. § 251.54(e)(5) (2013). Indeed, the administrative record shows that the Forest Service does not just act as a "rubber stamp" imposing no restrictions on concessioner permits; it has demonstrated that it is willing to reject or modify proposed concessioner fees to ensure that visitor fees have an adequate basis. *See, e.g.*, A.R. 1600–03 (partially approving concessioner fee increase proposal). Nor is the Court compelled by Plaintiffs' vague appeal to Congress's general intent to "strictly prescribe" recreation fees. "[A]s long as the statutory scheme is coherent and consistent, there generally is no need for a court to inquire beyond the plain language of the statute." *United States v. Ron*

*Pair Enters., Inc.*, 489 U.S. 235, 240–41 (1989). The clear language of the statute must prevail over contradictory statements contained in the legislative record.

As the Court has set forth, the REA's restrictions clearly do not apply to third parties who charge fees for goods or services as part of the Forest Service's concession program.

### 2. The Forest Service's Interpretation

Even if the REA were ambiguous, the Court would be required to turn to step two of the *Chevron* framework. Where an agency's guiding statute is ambiguous, courts look to the agency's interpretation before imposing their own. *See Chevron*, 467 U.S. at 843. Courts must defer to an agency's reasonable interpretation of the statute if the interpretation carries the force of law. *See Gonzales*, 546 U.S. at 255–56. If the interpretation is embodied in a text that does not carry the force of law, however, a court may still give some weight to the interpretation based on its "power to persuade"—that is, based on the agency's thoroughness, consistency, formality, or expertise in issuing the interpretation. *See generally Skidmore*, 323 U.S. at 140. The Forest Service has, in a number of contexts, interpreted the REA and the Granger–Thye Act as setting forth two separate regimes—the former governing fees charged by the Forest Service, and the latter governing fees charged by third parties. Because the Forest Service's interpretation has only been set forth in documents lacking the force of law, the Court analyzes the interpretation according to its "power to persuade."

The Forest Service points to two internal sources showing that it has interpreted the REA as inapplicable to third-party concessioner permits. *See generally* Fed. Def.'s Mem. P. & A. Supp. Cross-Mot. Summ. J. 18–22. The Forest Service's April 2005 Interim Implementation Guidelines, issued just after the enactment of the REA, state: "Concession-operated sites are not included in the REA authority. These operations will continue under their existing permits and

authorities." A.R. 768. In its public involvement strategy for recreation fees, issued the following year, the Forest Service stated: "Concessionaire-managed facilities are not covered in the Recreation Enhancement Act." A.R. 678.

The Forest Service also points to additional sources reflecting that multiple agencies have agreed on this interpretation of the REA. The Interagency Handbook, which expresses the interpretation of all covered federal land management agencies, states that the scope of the REA is limited to lands managed by one of the federal agencies. *See* A.R. 629. And in the triennial reports the agencies must send to Congress as required by the REA, *see* 16 U.S.C. § 6808 (2012), the agencies do not make reference to concessioner fees. *See, e.g.*, A.R. 407–545, 555–624, 679–761. Indeed, the questions and answers for congressional oversight hearings expressly distinguish between government-managed recreation sites and concessioner-operated sites. *See, e.g.*, A.R. 659–60, 669–70.

Although these documents did not undergo the scrutiny of formal notice-and-comment procedure, the Forest Service's interpretation nonetheless deserves some degree of deference because the sources show a consistent interpretation, since the inception of the REA, across multiple agencies. *See Good Samaritan Hosp.*, 508 U.S. at 417 ("[T]he consistency of an agency's position is a factor in assessing the weight that position is due."). Moreover, the Forest Service's interpretation is logical. As the administrative record reflects, because concessioners are not funded by taxpayer dollars as the Forest Service itself is, it makes sense that visitors who enter concessioner-managed areas are expected "to pay the true cost for those services." A.R. 232.

Plaintiffs point to the recreation area prospectuses, several of which state that "[t]he permit holder may charge the public fees only to the extent that the Forest Service can charge

recreation fees under the [REA]." *See, e.g.*, A.R. 1155. However, it is not clear that this reflects a Forest Service *interpretation* of the REA itself. The way the Court reads the prospectuses, they reflect, at worst, a permitting judgment that it is preferable that concessioners only charge fees that the agency itself would be able to charge. From a policy perspective, neither party argues that the Forest Service cannot require a permittee to structure its fees according to the REA's requirements even if the REA does not apply directly to the concessioner. It is also important to note that these restrictions did not make their way into the permits themselves.

Thus, even if the REA were ambiguous on the issue, the Court would defer to the Forest Service's consistent and logical interpretation that the statute is inapplicable to third-party concessioners.

### 3. Application of the REA

Having determined that, under section 14(e), fees charged by concessioners for providing a good or service under the Granger–Thye Act are exempt from the REA, the Court applies the statute to the case at bar. Plaintiffs concede that the five permits at issue in this case were authorized under the Granger–Thye Act and its implementing regulations. *See* Pls.' Reply 21. Thus, the remaining issue is whether the concessioners' fees were for a "good or service" they provided to Plaintiffs. *See* 16 U.S.C. § 6813(e). The Court concludes that the fees satisfy this requirement.

The operating plans for the recreation sites at issue in this case all set forth a plethora of services the concessioners must provide. These services include, among many other things, maintaining parking lots and restrooms, providing access to safe drinking water, inspecting the areas for safety hazards, testing for diseases, enforcing rules and capacity limits, providing emergency and first-aid services, cleaning up litter, and clearing trails. *See generally* A.R. 825–

54 (Rose Canyon Lake); A.R. 971–99 (Second Crossing); A.R. 1604–721 (Rampart Reservoir); A.R. 2103–76 (Big Eddy and Bagby Hot Springs); A.R. 3433–58 (Walton Lake).

Plaintiffs, citing *Adams v. United States Forest Service*, 671 F.3d 1138 (9th Cir. 2012), argue that services are not fee-eligible unless the person charged actually uses the service. *See* Pls.' Reply 15–16. Setting aside the fact that *Adams* dealt with the application of an REA provision that governs fees charged by the Forest Service itself, the Court need not decide whether the "actual use" principle extends to section 14(e) because *all* visitors who enter these areas actually benefit from the services that the concessioners in this case provide. Intervenor–Defendants point out, and Plaintiffs do not dispute, that all visitors benefit from services such as trail and area cleanliness, safety monitoring, health monitoring, rule enforcement, educational and instructional signage, and availability of emergency services provided in these recreation areas.[7] *See generally* Def.–Intvrs.' Cross-Mot. Summ. J. 16–35. Moreover, Plaintiffs visiting at least four of the six sites at issue parked in designated areas that are maintained by the concessioners, *see* Adams Decl. ¶ 12, ECF No. 25-2; Lewis Decl. ¶ 12, ECF No. 25-3; Sample Decl. ¶ 5, ECF No. 25-4; Silver Decl. ¶ 10, ECF No. 25-5; Wimert Decl. ¶ 6, ECF No. 25-6—a clear "use" of concessioner services.[8]

---

[7] Indeed, in *Adams*, the Ninth Circuit suggested that services from which visitors passively benefit, such as security services, may constitute "services" under the statutory provision at issue in that case. *See Adams*, 671 F.3d at 1145. However, because the statutory provision under analysis in that case required use of "facilities *and* services," the court did not reach the issue of whether security services alone were sufficient. *See id.*; *cf.* 16 U.S.C. § 6813(e) (exempting third-party fees for a "good *or* service" (emphasis added)).

[8] The Court is concerned by the apparent lack of employee training occurring at certain concessioner sites, resulting in visitors being charged fees in excess of those allowed under their permits and operating plans. CLM concedes that the fee charged to Ms. Harwood and her hiking companions at Bagby Hot Springs was not authorized, because the visitors did not use the hot springs and were only passing through the area. *See* Def.–Intvrs.' Cross-Mot. Summ. J. 27 n.4. Although CLM states that the fee would have been refunded if a complaint were made, the vast majority of visitors are not likely to know the details of CLM's approved operating plan; that

It is the Court's task to apply the law according to its plain meaning, and the REA clearly does not apply to concessioners who provide goods or services under permits issued pursuant to the Granger–Thye Act and its implementing regulations. The Court will therefore enter judgment in favor of Defendants as to Count I.

## C.  Review Procedures (Count II)

The Court turns next to Count II of Plaintiffs' complaint. In that cause of action, Plaintiffs allege that the Forest Service was required, but failed, to put the special use permits through the REA's public notice and RRAC process before approving them. *See* Compl. ¶¶ 30–31, ECF No. 1. Thus, Plaintiffs argue, the Forest Service exceeded its statutory authority in issuing the permits. *See* 5 U.S.C. § 706(2)(A), (C) (2012).

Based on the REA's plain language, it is clear that third-party permits issued under other statutes need not undergo the REA's public notice and RRAC procedure. The relevant statutory provisions clearly state that the procedure applies to fees established or modified "under this chapter." 16 U.S.C. § 6803(a) (2012). Plaintiffs concede that the concessioner permits are authorized under the Granger–Thye Act and not the REA. *See* Pls.' Reply 21, ECF No. 38.[9]

Because the REA's public notice and RRAC provisions clearly do not apply to permits issued to third-party concessioners, the Court will enter judgment in favor of Defendants as to Count II.

---

burden should be on CLM and its staff. But, Intervenor–Defendants are correct that an APA action is not the proper avenue to recover a fee that was never authorized by the Forest Service.

[9] Plaintiffs also concede that the Forest Service has consistently interpreted the REA's procedural provisions as inapplicable to third-party permits. *See* Pls.' Mot. Summ. J. 24, ECF No. 30; *see also, e.g.*, A.R. 678 ("Concessionaire-managed facilities are not covered in the [REA]. Fee changes at these facilities do not require the same public involvement processes as those operated by the Forest Service.").

**V.  CONCLUSION**

The REA sets forth detailed requirements governing the recreation fees the Forest Service may charge.  But, as set forth above, those requirements do not apply to third-party concessioners.  For the foregoing reasons, the Court will deny Plaintiffs' motion for summary judgment and grant Defendants' motions for summary judgment.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  March 28, 2014                                    RUDOLPH CONTRERAS
                                                         United States District Judge